UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 JAN -7  PM 1:50

BY_____
DEPUTY CLERK

TAMMY T., )
)
Plaintiff, )
)
v. )          Case No. 5:21-cv-1
)
KILOLO KIJAKAZI, Acting Commissioner )
of the Social Security Administration,[1] )
)
Defendant. )

**OPINION AND ORDER**
**(Docs. 10, 11)**

Plaintiff Tammy T. brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3),
requesting reversal of the decision of the Commissioner of Social Security denying her
application for supplemental security income and an award of benefits or, in the alternative, a
remand to the Commissioner for further proceedings. Pending before the court are Plaintiff's
Motion to Reverse the Decision of the Commissioner (Doc. 10) and Defendant's Motion for
Order Affirming the Commissioner's Decision (Doc. 11).

For the reasons stated below, Plaintiff's motion is GRANTED, in part; the
Commissioner's motion is DENIED; and the matter is REMANDED for further proceedings and
a new decision.

**Factual Background**

Plaintiff was 33 years old on her alleged onset date of January 28, 2017. (AR 260.) At a
January 9, 2019 hearing, Plaintiff testified that her anxiety, panic attacks, and depression limited

---

[1] Dr. Kilolo Kijakazi has been automatically substituted as the Defendant after assuming
the role of Acting Commissioner on July 9, 2021.

her ability to work. (AR 40.) She further testified that she cannot leave home by herself without worrying or thinking people are talking about her. (*Id.*) She testified as to mental impairments and serious attachment to her mother, saying she is not able to go anywhere without her mother and testified that she does not currently have friends she sees regularly. (AR 42–44.) She also testified to physical impairments including asthma, allergies, migraines, fibromyalgia, and diabetes. (AR 43–45.) The record also reflects diagnoses for long-standing learning and/or intellectual disability, obesity, dependent personality disorder, agoraphobia, gallstones, below average intellect, and post-traumatic stress disorder. (AR 383, 423, 562, 565, 812–813, 907, 909, 988, 999.)

Plaintiff testified that she was formerly in a civil union and does not have children. (AR 38.) Plaintiff testified that she currently lives with her mother and has lived with her mother for her entire life. (AR 39, 41.) Plaintiff has a history of sexual trauma. She reports being molested at seven years old. (AR 542, 563.) Plaintiff further testified that she left school after being unable to complete the 10th grade due to panic attacks, and that although she tried to get her GED, she was unable to complete her program because her panic attacks got worse. (AR 39.) Plaintiff had previously been held back in kindergarten, second grade, and eighth grade. (AR 988.) Plaintiff testified that she last tried to work by applying for a job at Papa John's but was denied. (AR 44.) She also held various jobs sporadically between 1999 and 2005, including at Dominos Pizza, Ames Department Store, Grand Union Company, and Litwhiler Enterprises, Inc. (AR 209.)

Aside from mental health treatment Plaintiff received as a teenager after reporting self-harm and cutting, Plaintiff did not begin long-term psychological therapy until 2011. (AR 988.) In 2013, Plaintiff completed a neuropsychological evaluation and began visiting with

psychologists to determine her cognitive functioning as it related to a history of emotional dysregulation, ADHD, and low scores on cognitive screenings. (AR 988.) During this psychiatric evaluation, Plaintiff expressed some degree of independence but stated that she "relies on her mother for most basic needs." (AR 990.) Following this evaluation, Plaintiff received diagnoses for anxiety, personality disorder, dependent personality traits, depression, low IQ, and intellectual abilities within the borderline-impaired range. (AR 996, 812–813.)

Plaintiff's dependent personality disorder manifests as an attachment to her mother. Plaintiff testified that she cannot go anywhere without her mom. (AR 42.) She goes grocery shopping and to appointments with her mother. (AR 42–43.) She testifies that leaving the house and being away from her mom cause her to think that everybody is talking about her and leads to panic attacks. (AR 43.) Plaintiff's social anxiety limits her ability to interact with others and Plaintiff testified that she does not currently have any friends she sees in-person on a regular basis. (AR 44.)

Several treating medical sources mention Plaintiff's dependence upon her mother as a component of her medical diagnoses for anxiety, agoraphobia, borderline intellectual functioning, and dependent personality disorder. For instance, Sara R. Roberts M.D.—a primary care physician at the University of Vermont Medical Center who treated Plaintiff for physical and psychological impairments between approximately July 2015 and May 2017—observed Plaintiff's attachment to her mother. (AR 904, 907.) Dr. Roberts noted Plaintiff's agoraphobia, depression, anxiety, and dependent personality traits limit her ability to leave home. (AR 909.) Dr. Roberts also observed that Plaintiff expressed a fear of public places consistent with her anxiety, agoraphobia, and dependent traits. (AR 904.) Plaintiff's medical record notes that her

mother accompanied her to medical visits at least six times between May 2017 and May 2018. (*See* AR 467, 474, 480, 483, 539, 562, 725.)

Following an argument with a friend on the telephone in February 2018, Plaintiff became "suicidal and depressed" and consumed 10–20 Tylenol tablets in an apparent suicide attempt. (AR 539, 541–42.) Following this episode, Plaintiff writes that beginning in spring 2018, she experienced "increased difficulty managing physical and mental health disabilities," and by summer 2018, says she experienced "increased panic and difficulty leaving the house." (AR 253, 273.)

Plaintiff testified that in an average day she will eat breakfast, talk to her mom, watch TV, take naps, and play Xbox. (AR 42.) She testified that she only leaves home with her mother to go to the grocery store or to attend medical appointments. (AR 42–43, 46.) Plaintiff also testified that she sees Nurse Practitioner Tracey Niquette for her medical conditions and had seen Carol McKnight, M.A., a psychologist and Licensed Mental Health Practitioner, for counseling from January 2012 until April 2018. (AR 36, 42–43, 70.)

Plaintiff filed an application for supplemental security income on November 17, 2017, alleging a disability beginning January 28, 2017. (AR 87.) The claim was denied on March 23, 2018 (AR 86–103) and again upon reconsideration on July 27, 2018. (AR 105–122.) Plaintiff then filed a request for a hearing (AR 139–141), which was held via video conference on January 9, 2019. (AR 31–58.) Plaintiff was represented by Margaret Sayles, a non-attorney representative, and was represented at the hearing by Meriam Hamada, a non-attorney representative. (AR 16, 124.) Lynn Paulson, a vocational expert (VE), appeared and testified at the January 9, 2019 hearing. (AR 49.) Administrative Law Judge Dory Sutker denied Plaintiff's application for supplemental security income via written decision on April 3, 2020. (AR 13–30.)

Ms. Sayles submitted a request for review on June 4, 2020 (AR 8–12), which Administrative

Appeals Judge Thomas Funciello denied on November 4, 2020. (AR 1–6.) This appeal followed.

Additional facts are set forth as necessary below.

### ALJ Decision

Social Security Administration regulations set forth a "five-step, sequential evaluation

process" to determine whether a claimant is disabled. *Estrella v. Berryhill*, 925 F.3d 90, 94

(2d Cir. 2019) (quoting *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014)).

First, the Commissioner considers "whether the claimant is currently engaged in

substantial gainful activity." *Id.* Second, if the claimant is not currently engaged in substantial

gainful activity, then the Commissioner considers "whether the claimant has a severe impairment

or combination of impairments." *Id.* Third, if the claimant does suffer from such an impairment,

the inquiry is "whether the impairment meets or equals the severity of the specified impairments

in the Listing of Impairments." *Id.* Fourth, if the claimant does not have a listed impairment, the

Commissioner determines, "based on a 'residual functional capacity' assessment, whether the

claimant can perform any of his or her past relevant work despite the impairment." *Id.*

Finally, if the claimant is unable to perform past work, the Commissioner determines

"whether there are significant numbers of jobs in the national economy that the claimant can

perform given the claimant's residual functional capacity, age, education, and work experience."

*Id.*; *see* 20 C.F.R. § 416.920. The claimant bears the burden of proof at steps one through four.

*Estrella*, 925 F.3d at 94. At step five, there is a "limited burden shift to the Commissioner" to

"show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*,

566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

Employing the sequential analysis, ALJ Sutker first determined that Plaintiff has not engaged in substantial gainful activity since November 17, 2017, the date of Plaintiff's application. (AR 18.) At step two, the ALJ found that Plaintiff had the following severe impairments during the relevant period: anxiety disorder, panic disorder, obesity, borderline intellectual functioning, post traumatic stress disorder, depressive disorder, and diabetes mellitus. (*Id.*) The ALJ noted that these severe impairments significantly limited the claimant's ability to perform basic work activities as required by SSR 85-28. (*Id.*) The ALJ also stated Plaintiff's asthma and hypertension "do not rise to the level of severe impairment," and that Plaintiff's fibromyalgia "does not qualify as a medically determinable impairment." (AR 19.) The ALJ then ruled out Plaintiff's past history of narcolepsy because it was "not confirmed as a diagnosis." (*Id.*)

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, App'x 1. (AR 19.)  The ALJ specifically referred to listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.15 (trauma- and stressor-related disorders). The ALJ did not mention listing 12.05 (intellectual disorders).

Next, the ALJ determined that Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b):

> [S]he should have no exposure to hazards such as unprotected heights and dangerous moving machinery. She can never climb ladders, ropes, or scaffolds. She should have no exposure to dust, fumes, odors, gases, and other pulmonary irritants, such as a chemical plant, rubber factory, or tire store. She can be exposed to a regular environment. She should have no exposure to temperature extremes and no more than a moderate noise level. The claimant can perform uncomplicated tasks, defined as those typically learned in 30 days or less. She can have incidental contact with the general public, meaning dealing with the general public cannot be part of

job duties but she can handle brief encounters such as passing someone in the hallway. She would need an environment where tasks are typically performed in a solitary manner, but she can tolerate performing tandem tasks up to 10% of the workday. In such a setting, she can interact with coworkers and supervisors on routine matters. Her concentration, persistence, and pace is somewhat variable due to symptoms, but she would be on task at least 90% of the workday.

(AR 21.)

At step four, the ALJ concluded that Plaintiff has no past relevant work experience. (AR 25.) Considering the Plaintiff's age, education, work experience, and RFC, and testimony from the VE, the ALJ found at step five that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (AR 25.) The ALJ concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since November 17, 2017. (AR 26.) In doing so, the ALJ credited the opinions of three non-examining state agency physicians who concluded that while Plaintiff suffered from mental health conditions, she "should be able to do low-stress jobs that are easy to learn." (AR 102.) The ALJ did not provide a persuasiveness finding for Carol McKnight, Plaintiff's treating psychologist since approximately 2012, regarding Plaintiff's extreme dependence upon her mother for basic daily activities away from the home, and declined to credit similar opinions of treating sources Dr. Roberts and Nurse Practitioner Tracey Niquette.

## **Standard of Review**

The Social Security Act (the "Act") defines disability, in pertinent part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the Act, a claimant will only be found disabled if his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In considering the Commissioner's decision, the court conducts "a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Estrella*, 925 F.3d at 95 (quoting *Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013) (per curiam)); *see also* 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla"—it means, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. of N.Y. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938)). The "substantial evidence" standard is even more deferential than the "clearly erroneous" standard; facts found by the ALJ can be rejected "only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis in the original). The court is mindful that the Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

<u>**Analysis**</u>

Plaintiff claims the ALJ failed to adequately evaluate whether Plaintiff meets the listing for intellectual disabilities and failed to incorporate all of Plaintiff's limitations related to that condition into her residual functional capacity finding. In addition, Plaintiff asserts that the ALJ's step-three finding is not supported by substantial evidence because the ALJ did not adequately evaluate the extent of Plaintiff's dependence on her mother. (Doc. 10 at 3–4.) Further, Plaintiff claims that ALJ Sutker failed to account for Plaintiff's lack of functional independence

in her RFC determination because she did not consider the total limiting effect of all impairments. (*Id.* at 6–7.) The Commissioner responds that the ALJ's decision is supported by substantial evidence and complies with the applicable legal standards. (Doc. 11 at 6.)

After considering these claims and reviewing the record, the court finds that the ALJ's decision is not supported by substantial evidence. ALJ Sutker is instructed to: (1) reconsider whether Plaintiff can *independently* perform the paragraph B functional criteria discussed herein at Section I; (2) assign a persuasiveness finding to all medical opinions in the record as required by regulation; (3) adopt the court's findings with respect to the supportability and consistency of the agency consultants opinions; (4) consider medical sources' integration of Plaintiff's self-reported subjective symptoms as objective evidence consistent with the relevant regulations; (5) consider whether Plaintiff meets listing 12.05B for intellectual disabilities; and (6) conduct a new RFC analysis given that the ALJ's RFC finding was affected by errors identified elsewhere in the decision.

## I.    The ALJ Erred in Her Step-Three Finding

In evaluating the severity of Plaintiff's mental impairments, the ALJ followed the process outlined at 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00 (Mental Disorders). This section of the Social Security regulations identifies 11 categories of mental disorders and provides a procedure for considering the severity and resulting disability in individual cases. The ALJ determined the relevant disorders to be depressive, bipolar, and related disorders (§ 12.04), anxiety and obsessive-compulsive disorders (§ 12.06), and trauma- and stressor-related disorders (§ 12.15). Each of these listings consists of three criteria. These establish the medical criteria for the disorder (paragraph A), the functional criteria used to determine the effect of the disorder on ability to work (paragraph B), and criteria for serious and persistent mental disorders (paragraph

C). To meet these listings, the claimant must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C. *See* 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(A)(2).

ALJ Sutker found that medical criteria were present for each of the three disorders, satisfying the paragraph A criteria. She found that there was not evidence sufficient to meet paragraph C standards and Plaintiff does not appeal that decision. The parties' dispute concerns the application of the paragraph B criteria, particularly as these relate to Plaintiff's strong dependency on her mother and her claim of inability to function outside of the household.

The paragraph B criteria measure a claimant's ability in the following areas of mental functioning:

- Understand, remember, or apply information;
- Interact with others;
- Concentrate, persist, or maintain pace; and
- Adapt or manage oneself.

20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(A)(2)(b). The ALJ found that Plaintiff suffered from moderate impairments in all four areas.

She concluded that Plaintiff had a moderate limitation in understanding, remembering, and applying information. She suffers from borderline intellectual deficits. In the ALJ's view, her cognitive functioning was "largely intact" and there was no evidence of language deficits precluding normal processing of information.

The ALJ concluded that Plaintiff has a moderate limitation in interacting with others due to anxiety and social isolation.

ALJ Sutker also concluded that Plaintiff has difficulties with memory and concentration consistent with her intellectual impairment but that these difficulties were not as limiting as alleged.

The ALJ concluded that Plaintiff had only moderate limitations in adapting and managing herself. She showed no signs of problems with personal care and was able to perform normal household chores.

To satisfy requirements for disability due to mental health, the Social Security regulations require that a claimant demonstrate that his or her "mental disorder . . . result in extreme limitation of one, or marked limitation of two, paragraph B areas of mental functioning." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(F)(2). Subsection 12.00(F)(2) establishes a five-point rating scale from "no limitation" to "extreme limitation." As relevant to mental functioning, "moderate," "marked," and "extreme" limitations are where the individual's ability to function "independently, appropriately, effectively, and on a sustained basis" is—respectively—"fair," "seriously limited," or an inability to so function. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(F)(2)(c)–(e). Ability to function "independently" is an essential component of this rating scale. The ALJ determined that the degree of functional disability evaluated through the application of the four paragraph B criteria was no worse than moderate for each of the listed mental health conditions. For this reason, she rejected Plaintiff's claim of disability.

On appeal, Plaintiff argues that the ALJ erred in failing to consider whether Plaintiff met criteria for listing 12.05B related to intellectual disabilities.[2] Her counsel notes that an IQ test in December 2013 resulted in a full-scale IQ of 72 and a verbal IQ of 70. These scores would satisfy the listing requirements of a full-scale score of 71–75 and a verbal or performance score of 70 or below. 21 C.F.R. 404, Subpart P, App'x 1, Listing 12.05B(1)(b). Plaintiff also contends that she satisfies the requirements that the deficit be present before age 22 and that the evidence

_____

[2] Plaintiff does not raise a claim under listing 12.05A, and so this claim has been waived.

would support a finding of one "extreme" or at least two "marked" limitations under the four paragraph B criteria. Plaintiff focused her claim on appeal on the evidence of limitations in social interactions (the second domain) and adapting and managing herself (the fourth domain).[3] Plaintiff argues that the ALJ's ratings of "moderate" limitations are unsupported by substantial evidence because the role that Plaintiff's mother plays in her life indicates a "lack of functional independence." (Doc. 10 at 3.)

Plaintiff also criticizes the ALJ's decision for failing to account for her lack of functional independence in considering her RFC. The ALJ concluded that despite her mental health limitations, she was able to work on her own with incidental contact with the general public and sustain routine interaction with co-workers and supervisors. (AR 21.) ALJ Sutker concluded that Plaintiff could perform adequately at least 90 percent of the time. In reaching this RFC determination, she relied on the opinions of the Commissioner's reviewing doctors and rejected the opinion of nurse practitioner Tracey Niquette as unpersuasive.

In response, the Commissioner argues that the ALJ's determination that the paragraph B criteria resulted in findings of moderate disability when applied to listings 12.04 (depression) and 12.06 (anxiety), there is no need to repeat the same analysis with respect to intellectual disability. The Commissioner credits the ALJ with giving sufficient consideration to Plaintiff's dependence on her mother in many aspects of her life. With respect to the RFC, the Commissioner argues

---

[3] Although Plaintiff notes that "ALJ Sutker's analysis of all four areas is lacking," Plaintiff's arguments focus on the second and fourth functional criteria, and Plaintiff does not otherwise mention the first or third functional criteria within paragraph B. (*Id.*) Accordingly, absent any argument or analysis on the first and third functional criteria, Plaintiff has waived potential arguments against the ALJ's finding that she has only moderate limitations in the "understand, remember, or apply information" and "concentrate, persist, or maintain pace" criteria. *See Rotolo v. Berryhill*, 741 F. App'x 851, 853 (2d Cir. 2018) (finding that a failure to raise issues in the district court generally constitutes waiver).

that under the new regulations that greatly reduce the deference previously accorded to the opinions of treating providers, the ALJ properly weighed the persuasiveness of the competing opinions for supportability and consistency. *See* 20 C.F.R. § 416.920c(a).

The court turns to the record evidence and analysis on each of these issues.

### A.   Functional Criteria: Interact with Others

Plaintiff argues ALJ Sutker's finding that Plaintiff has only moderate limitations in social interaction is not supported by substantial evidence. (Doc. 10 at 3–4.)  She maintains that "[s]ocial dependence is a common feature of intellectual disabilities," and Plaintiff's social dependence upon her mother should have been considered in the ALJ's evaluation of her intellectual disability claim. (*Id.* at 4.) Plaintiff also argues that ALJ Sutker ignored evidence in the record that indicated Plaintiff's borderline intellectual functions and her dependence on her mother greatly limited her capacity to work in an independent environment, and failed to adequately consider evidence from long-term medical providers who indicated her impairment was serious. (*Id.* at 9.)

ALJ Sutker found Plaintiff has only moderate limitations in social interaction. (AR 20.) As support for Plaintiff's moderate limitation in social interaction, she writes that "claimant presented as aggravated, intermittently shouting, and as irritable," but that this "was not her baseline presentation . . . as she was otherwise able to interact appropriately with treating providers and office staff." (*Id.*) In further support of her determination of social interaction, she writes that Plaintiff is able to use public transportation and maintain a relationship with someone in a different state, with whom she texted and video chatted each day. (*Id.*) In her RFC determination, ALJ Sutker also considered Plaintiff's limited skills in terms of reading and math, her history of panic attacks and depression, difficulty interacting with others, and Plaintiff's

capacity for taking public transportation, going to counseling, and shopping. (AR 22.) ALJ Sutker's only mention of Plaintiff's dependence upon her mother appears in her adaptation and management finding, wherein she notes Plaintiff "leaves home with her mother," but is not explicitly considered in her social interactions finding. (AR 20.)

### 1.    Interaction with Treating Providers and Staff

The evidence in the record supports ALJ Sutker's conclusion that Plaintiff can interact appropriately with medical staff. (AR 22.) Plaintiff argues her ability to conduct herself in an appropriate manner depends upon her proximity to her mother during appointments. (Doc. 10 at 7.) Dr. Roberts noted that Plaintiff became "flushed" and agitated when separated from her mother during appointments. (AR 443.) Carol McKnight, Plaintiff's long-term psychotherapist writes, "[Plaintiff's] mother accompanies her to the office for almost all of her appointments." (AR 1006–07.) The administrative record contains numerous references to Plaintiff's mother accompanying her to medical and psychiatric appointments. (*See* AR 326, 328, 541, 562, 725, 751, 959, 863, 988, 999, 1004, 1034.)

A person's ability to be "friendly" and "cooperative" in some situations does not undermine the conclusion that she may be severely limited in different kinds of social interactions. *See Stacey v. Comm'r of Soc. Sec. Admin.*, 799 F. App'x 7, 10 (2d Cir. 2020) ("[Plaintiff] occasionally being in a good mood does not undermine the conclusion that he is severely limited in social interactions."); *see also Jennifer W. v. Comm'r of Soc. Sec.*, No. 5:19-cv-37, 2020 WL 549357, at *13 (D. Vt. Feb. 4, 2020) ("[I]t is possible for a claimant to appear 'normal' at a medical appointment while at the same time suffering from debilitating depression or another mental illness."). Indeed, an individual may simultaneously appear "friendly" or "normal" while also suffering from a disabling mental impairment. *Stacey*, 799 F. App'x at 11

(finding it "improper" for the ALJ to rely on a physician note that claimant was "normal" when that same physician diagnosed the claimant with ADHD). These cases demonstrate, and the court agrees, that it is inappropriate to infer from isolated instances of friendly behavior that the individual would always display similar capacity for social interaction in the workplace. However, the only instance in the medical record that expressly indicates Plaintiff's friendly and appropriate conduct with treatment providers was dependent in part on the presence of her mother was Dr. Roberts' observation that Plaintiff became "flushed" when separated from her mother during appointments. (AR 443.) Accordingly, the ALJ should reconsider Plaintiff's ability to conduct herself appropriately with treating providers outside of her mother's presence and reevaluate Plaintiff's capacity to function independently in social interactions.

### 2.     Use of Public Transportation

ALJ Sutker notes Plaintiff's ability to ride public transportation as evidence of moderate limitations in social interaction. (AR 20.) However, the record demonstrates that although Plaintiff sometimes leaves the home with friends or while listening to music (*see* Doc. 11 at 5), she generally does not ride public transportation "independently." For instance, Plaintiff testifies that she gets to appointments by taking the bus with her mom. (AR 42.) She says "she cannot go anywhere by herself." (AR 562.) NP Tracey Niquette writes, "[Plaintiff] has great difficulty leaving her house alone, she would not be able to go to work independently. Usually travels with her mother, sometimes she is able to leave her house if she has music playing." (AR 1006.) She also writes that Plaintiff "experiences panic attacks followed by persistent concern or worry and disproportionate for her anxiety for example about being outside her home, being in open spaces, being in a crowd." (AR 972.)  In 2018, Dr. Elizabeth Levine writes that Plaintiff "lives with her mother and cannot leave the house without her. She will leave with her mother only about 3–4

times per week." (AR 490.) Dr. Roberts described Plaintiff's relationship with her mother as a

"debilitating dependent relationship," and notes that "she appears anxious on any occasions

when she [is] separated from her mother." (AR 443.)  The agency consultant reports are silent as

to whether Plaintiff can travel or complete day-to-day activities independently. Plaintiff's

subjective reporting of her inability to travel independently and her medical providers' opinions

are supported by objective evidence in the record that Plaintiff's mother accompanies her to

most, if not all, appointments. (*See* AR 326, 328, 541, 562, 725, 751, 863, 959, 988, 999, 1004,

1034.)

The ALJ's reliance on Plaintiff's capacity to ride public transportation—whether

independently or only with her mother's support—is not altogether persuasive in the context of

the social interaction analysis. In some cases, an individual's ability to use public transportation

can contribute to an understanding of their ability to interact socially. *See Brenda R. v. Comm'r*

*of Soc. Sec.*, No. 2:13-cv-283-jmc, 2018 WL 4144681, at *6 (D. Vt. Aug. 30, 2018). However,

an individual's ability to use public transportation generally says little, on its own, about that

person's capacity to interact with others. *See Gainous v. Comm'r of Soc. Sec.*, No. 19-CV-10599

(BCM), 2021 WL 4847071, at *5 (S.D.N.Y. Oct. 18, 2021) (ability to use public transportation

not useful in social interaction analysis); *Luke H. v. Saul*, No. 3:19-CV-720 (DJS), 2020 WL

4346789, at *4 (N.D.N.Y. July 28, 2020) (inability to take public transportation does not mean

plaintiff cannot adequately relate to others).

Because the evidence in the record shows that Plaintiff usually requires the assistance of

others to take public transportation, the ALJ's conclusion that Plaintiff's ability to ride public

transportation as evidence of moderate limitations in social interaction is not supported by

substantial evidence. On remand, the ALJ is instructed to reconsider whether Plaintiff's

dependence upon others to use public transportation is persuasive in the context of the social

interactions analysis and if so, whether Plaintiff accordingly suffers more than a "moderate"

limitation in social interaction.

### 3.    Interpersonal Relationships

Last, ALJ Sutker references Plaintiff's relationship with someone in a different state, with

whom she texted and video chatted each day, as evidence of her finding of a moderate limitation

in interacting with others. (AR 20.) Plaintiff argues this relationship shows that "Plaintiff's

reliance on the internet for social interaction" demonstrates a limited capacity for healthy,

appropriate in-person relationships. (Doc. 10 at 7.)

Although Plaintiff testified that she does not currently have friends that she sees in-

person on a regular basis, it appears that she has had friends in the past. (AR 44; AR 115 (had

sexual relationships); AR 564 (smoked with friends); AR 565 (allegedly kept a friend's child

from hurting herself); AR 725 (had a friend who recommended taking Aubra medication);

AR 815 (had a friend taking Metformin); AR 864, 989 (had a boyfriend); AR 1004 (a friend

would sometimes accompany her to appointments)). Even assuming Plaintiff no longer sees

these friends in-person, her continued ability to socialize online can be some evidence supporting

the conclusion that Plaintiff has only a "moderate" limitation in interacting with others.

*See Hochstine v. Comm'r of Soc. Sec.*, No. 1:18-cv-699-DB, 2019 WL 5448287, at *4

(W.D.N.Y. Oct. 23, 2019) (considering evidence of online socialization in finding a moderate

limitation in social interaction); *see also Luke H.*, 2020 WL 4346789, at *4 (evidence that

plaintiff only socializes with friends online does not necessarily mean plaintiff can not

adequately relate to others).

Nevertheless, at least two medical experts expressed concern with Plaintiff's preference for online friendships in lieu of in-person ones. Carol McKnight writes:

> Her current relationships seem to be mostly through the internet. She has developed cyber connections/friendships with women she has met over the internet, and considered them girlfriends. These relationships, though for the most part she never meets the women and in fact they may live may states away, are quite preoccupying and real to Tammy. They seem to be the safest way she can feel connected to anyone outside of those with whom she is most familiar.

(AR 1006–07.) Dr. Roberts also notes Plaintiff's "fear of social situations." (*Id.*) However, because Carol McKnight did not submit treatment notes, the ALJ could not corroborate her statement and noted the remainder of the medical evidence of record does not provide good support for Plaintiff's allegations regarding symptomatology and functional deficit. (AR 22–23.)

The court will not second-guess the ALJ's conclusions regarding Plaintiff's online and in-person relationships, as the ALJ's findings in this regard are supported by evidence in the record and are consistent with legal precedent. On remand, the ALJ is instructed to reconsider the effect of Plaintiff's serious dependence upon her mother in her analysis of Plaintiff's limitations in social interaction, especially concerning Plaintiff's demeanor with medical providers and her capacity to independently use public transportation, consistent with this decision.

**B.      Functional Criteria: Adapt or Manage Oneself**

Plaintiff argues the ALJ's determination that Plaintiff has only a "moderate" limitation regarding her ability to adapt or manage oneself is not supported by substantial evidence. (Doc. 10 at 6.) Plaintiff again takes issue with ALJ Sutker's treatment of Plaintiff's ability to independently take public transportation, with which the court agrees and will not reiterate here. (Doc. 10 at 7.) In addition, Plaintiff argues the ALJ's conclusion that Plaintiff's ability to accomplish daily tasks means Plaintiff is not severely limited in adapting or managing herself is

not supported by substantial evidence because Plaintiff can only perform these activities with the support of her mother.

The ALJ writes that Plaintiff "was able to attend appointments as scheduled and use public transportation. She endorsed no difficulty with personal care, except for brushing her long hair, which her mother does. She is able to prepare complete meals, did not endorse difficulty doing house or yard work, leaves home with her mother, shops for groceries, and has hobbies and friends." (AR 20.) Although the ALJ noted Plaintiff could leave home "with her mother," the ALJ's conclusion that Plaintiff "was able to attend appointments as scheduled and use public transportation" did not sufficiently consider Plaintiff's ability to complete such tasks independently, which is an essential component of the limitation rating scale. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(F)(2)(c)–(e). Accordingly, the court agrees with Plaintiff that the ALJ's determination regarding Plaintiff's "moderate" limitation in adapting and managing herself is unsupported by substantial evidence.

The ALJ concluded that Plaintiff's ability to complete daily activities supports a finding that Plaintiff suffers only a "moderate" limitation in her ability to adapt or manage herself. (AR 20.) Contrary to the ALJ's finding that Plaintiff was able to attend appointments, use public transportation, and shop for groceries apparently independently, Plaintiff testified that she did not attend appointments, use public transportation, and shop for groceries alone. Plaintiff reports that she does not go to any places on a regular basis except to the store "when needed with my mom." (AR 244.) In a typical day, Plaintiff will eat breakfast, sit at the table and talk to her mother, watch TV, and play Xbox. (AR 42.) Although Plaintiff appears capable of completing most daily activities at home including cooking, cleaning, and basic personal care, once Plaintiff needs to leave the home, she generally must be accompanied by her mother. (*Id.*)

An individual's ability to accomplish daily tasks when their physical or psychiatric disability has been addressed does not mean he or she is not disabled; rather, it means their disability has been appropriately accommodated to allow them access to the public spaces that able-minded and able-bodied individuals enjoy. Just as it would be inappropriate for an ALJ to conclude that a wheelchair-bound individual is not disabled because they can shop, take public transportation, and enjoy hobbies while using their wheelchair, so too would it be improper to conclude that an individual who requires the constant presence of a support person is not disabled because that individual can complete daily activities while in the presence of that person. The Second Circuit has highlighted that where the ALJ neglects to consider the claimant's dependence upon another to help them perform their daily activities, this "misreading of the evidence" warrants remand. *See Mariani v. Colvin*, 567 F. App'x 8, 10–11 (2d Cir. 2014) (finding error where the ALJ neglected to note that the plaintiff needed help shopping and doing chores).

Here, the ALJ's finding that Plaintiff has only a "moderate" limitation regarding her ability to adapt or manage herself because she was able to attend appointments, use public transportation, and shop for groceries did not adequately account for Plaintiff's degree of reliance upon her mother in performing these activities. The Commissioner's conclusion that "the evidence merely shows that she and her mother usually left their home together, not that she could not function independently without her mother," ignores Plaintiff's testimony and observations of medical providers emphasizing Plaintiff's clinical dependency upon her mother. (Doc. 11 at 6.) Indeed, the Commissioner's summary of Plaintiff's medical provider noting that Plaintiff "*usually* travels with her mother, *sometimes she is able to leave her house* if she has music playing," (emphasis in original) ignores the preceding sentence in that record which states,

"Tammy has great difficulty leaving her house alone, she would not be able to go to work independently." (*Id.*; AR 951–73.) The Commissioner similarly identifies only favorable evidence in noting Ms. McKnight's observation that Plaintiff's mother accompanies her to the office for "almost all" appointments as proof that Plaintiff's argument that she could not leave home alone was false. (*Id.*) The Commissioner does not, however, address Ms. McKnight's conclusion that "Tammy has a fear of going out without her mother or a friend," and that the "very limited environment of an apartment with her mother and pets seems to be what Tammy can manage without being too frequently overwhelmed with anxiety, depression, self-harm through cutting, anger, and other emotional problems." (AR 1004–1005.) *See Christopher C. v. Comm'r of Soc. Sec.*, No. 2:19-cv-214-jmc, 2020 WL 6193907, at *6 (D. Vt. Oct. 22, 2020) (ALJ cannot recite only that evidence which supports her findings while ignoring contrary evidence). The Commissioner's conclusion that the evidence "does not actually establish" that Plaintiff is unable to leave the home without her mother is thus an incomplete accounting of the record. (Doc. 11 at 5.) In any event, for a finding of a "marked" limitation in this regard, Plaintiff need not show that it is *impossible* for her to leave the home unaccompanied, only that she is "seriously limited," in so doing. *See* 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(F)(2)(c)–(e).

As in *Mariani*, the ALJ's failure to note that Plaintiff needs help to complete certain activities of daily living constitutes a "misreading of the evidence" and warrants remand regarding the severity of Plaintiff's limitation in her ability to adapt and manage herself. *See Mariani*, 567 F. App'x at 10–11. Accordingly, on remand, the ALJ should reassess Plaintiff's ability to *independently* perform activities of daily living, including shopping, travel, and other chores, in her step three determination, and evaluate whether her findings have prejudiced the Plaintiff at later steps in the sequential evaluation.

## II.     Residual Functional Capacity

Plaintiff argues that ALJ Sutker's unwillingness to acknowledge Plaintiff's lack of functional independence impacts the accuracy of her RFC finding, as ALJ Sutker does not account for Plaintiff's extreme dependence upon her mother in the RFC. (Doc. 10 at 6–7.) Specifically, Plaintiff argues that ALJ Sutker ignored evidence in the record that indicated Plaintiff's borderline intellectual functions and her dependence on her mother greatly limited her capacity to work in an independent environment, and improperly relied on flawed opinions of agency doctors who considered Plaintiff's anxiety in isolation from her other severe mental impairments. (Doc. 10 at 9.) Plaintiff also argues the ALJ's failure to consider listing 12.05B for intellectual disorder as part of the total limiting effect of all impairments resulted in an RFC determination beyond that which Plaintiff can do despite the effects of her limitations. (Doc. 10 at 8–9.) The Commissioner responds that the ALJ properly relied upon the findings of the state agency psychologists over the opinions of Plaintiff's treating sources. (Doc. 11 at 7.)

ALJ Sutker determined Plaintiff could perform uncomplicated, light work with the following limitations: only incidental contact with the general public; an environment where tasks are typically performed in a solitary manner with in-tandem work performed up to 10% of the day; and only routine interactions with coworkers and supervisors. (AR 21.) In making this RFC determination, the ALJ followed the two-step process required by regulation. *See* 20 C.F.R. § 416.929; SSR 16-3p. The ALJ found the State agency non-examining medical and psychological consultants to be more persuasive than the medical and psychological treating sources in the record and adopted these findings in her RFC determination. (AR 23–24.) Plaintiff takes issue, however, with the agency doctors' and ALJ's failure to consider Plaintiff's dependent relationship on her mother in reaching their conclusions regarding Plaintiff's capacity

to work independently. (Doc. 10 at 9.) Plaintiff argues the agency consultants "completely ignore[] the dependent relationship that Plaintiff has with her mother that has formed by a combination of her intellectual disability, past traumas, and anxiety." (Doc. 10 at 9.) In essence, Plaintiff argues that the agency consultants' opinions are not more consistent or better-supported than the opinions of Plaintiff's treating sources, and thus ALJ Sutker's persuasiveness finding does not abide by the governing regulations.

 For claims filed on or after March 27, 2017, ALJs do not defer to, or give specific evidentiary weight to, any medical opinions. 20 C.F.R. § 416.920c(a). Instead, ALJs must evaluate medical opinions according to the following factors: supportability, consistency, relationship with the claimant, specialization, and other factors. *Id.* § 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. *Id.* § 416.920c(b)(2). Supportability is the extent to which an opinion or finding is supported by objective medical evidence and the medical source's supporting explanations, and consistency is the extent to which an opinion is consistent with other medical or non-medical sources. *Id.* § 416.920c(c)(1)– (2).

 Even though ALJs are no longer directed to afford controlling weight to treating source opinions—no matter how well-supported and consistent with the record they may be—the regulations still recognize the "foundational nature" of the observations of treating sources, and "consistency with those observations is a factor in determining the value of any [medical expert's] opinion." *Dany Z. v. Saul*, 531 F. Supp. 3d 871, 885 (D. Vt. 2021) (quoting *Barrett v. Berryhill*, 906 F.3d 340, 343 (5th Cir. 2018)). When treating sources provide opinions, these opinions will often be found more persuasive because "the examining relationship provides them with a better understanding of an applicant's condition." *Id.* (citing 20 C.F.R.

§§ 404.1520c(c)(3)(v), 416.920c(c)(3)(v)). This is especially true in the case of mental health impairments because objective evidence, such as bloodwork or visual imaging, cannot support a diagnosis, and so the psychiatrist's expert interpretation of the patient's subjective expression of their condition is frequently the sole diagnostic tool. *See Flynn v. Comm'r of Sec. Sec. Admin.*, 729 F. App'x 119, 122 (2d Cir. 2018) ("The treatment provider's perspective would seem all the more important in cases involving mental health, which are not susceptible to clear records such as x-rays or MRIs. Rather, they depend almost exclusively on less discretely measurable factors, like what the patient says in consultations."). This rule remains even after the recent eclipse of the treating physician rule. *See Shawn H. v. Comm'r of Soc. Sec.*, No. 2:19-cv-113, 2020 WL 3969879, at *6 (D. Vt. Jul. 14, 2020) (quoting *Barrett*, 906 F.3d at 343).

Separately, the court notes that under the supportability analysis, so-called "objective" evidence is not limited to X-rays, MRIs, and lab results, but can also include the clinical impressions of a physician. *See* 20 C.F.R. § 416.928 ("Psychiatric signs are medically demonstrable phenomena which indicate specific abnormalities of behavior . . . . They must also be shown by observable facts that can be medically described and evaluated."). Psychiatrists are trained to consider what the patient is saying, how they present, and to interpret the patient's moods, presentation, and expressions of paranoia or other distress in reaching their diagnosis. When a psychiatrist accepts what the patient is saying and incorporates their expression of their subjective experience into their notes and opinion, the court should rely on that opinion even if there is not any outwardly measurable manifestation of the impairment as would be available in physical impairment cases. *See Flynn*, 729 F. App'x at 122.

Psychological medical opinions will often be informed by the patient's subjective description of symptoms because the patient's reported experience of their mental condition is of

critical importance in diagnosing psychiatric impairments. *See Stacey*, 799 F. App'x 7. Here, the

underlying factual observations contained in the narrative and treatment notes of treating

therapist Carol McKnight and treating primary care providers Dr. Roberts and Tracey Niquette,

particularly concerning Plaintiff's agoraphobia, anxiety, dependence upon her mother, and panic

attacks, are objective evidence that is important in evaluating Plaintiff's mental condition.

However, neither the ALJ nor the state agency physicians meaningfully engaged with these

treatment notes, and the state agency physicians did not probe Plaintiff's attachment to her

mother in their findings. Although the ALJ is not required to discuss every piece of evidence

submitted, because Plaintiff's psychological impairments and her noted dependence upon her

mother constitute a central component of her claim, the lack of discussion in this regard could

prove harmful error if substantiated by medical sources. *Compare Noel C. v. Comm'r of Soc.*

*Sec.*, No. 2:18-cv-127, 2019 WL 3297051, at *11 (D. Vt. July 23, 2019) (ALJ is not required to

discuss every piece of evidence submitted). The court turns to a discussion of the ALJ's

treatment of Plaintiff's treating sources.

### 1.      Carol McKnight

Carol McKnight noted Plaintiff demonstrated "difficulties in follow through and

persistence"; "fear of going out without [Plaintiff's] mother or a friend"; "persistently inadequate

coping skills"; "[no] capacity to deal well with interpersonal situations, with impulse control, and

with feelings of anger"; "difficulty in enduring challenges to meet a longer term goal";

"communication challenges, . . . expressions of temper, frustration and confusion, and

experiences of failure"; and "[unable] to be able to develop the self-regulation and self-discipline

needed for even the most low wage employment." (AR 1004–05.) Ms. McKnight's opinion is

based on years of her ongoing psychotherapy with Plaintiff. Her comments are supported by

acceptable diagnostic techniques and are consistent with substantial evidence in the record,

including Plaintiff's own comments about her work history and observations by other treating

sources concerning Plaintiff's mental capacities and dependence upon her mother. However, the

absence of contemporaneous treatment notes or records make substantiating Ms. McKnight's

medical opinion difficult.

As a licensed or certified psychologist, Carol McKnight is an acceptable medical source

and her opinion letter is both a medical opinion and a recitation of other medical evidence under

the relevant regulations. *See* 20 C.F.R. §§ 416.902(a)(2)(i), 416,913(a)(2)–(3). Accordingly, ALJ

Sutker was required to analyze the persuasiveness of this medical opinion. *See* 20 C.F.R.

§ 416.920c(b) ("We will articulate in our determination or decision how persuasive we find all of

the medical opinions and all of the prior administrative medical findings in your case record.");

*Andrew G. v. Comm'r of Soc. Sec.*, No. 3:19-cv-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y.

Oct. 1, 2020) ("[T]he ALJ must still articulate how he or she considered the medical opinions

and how persuasive he or she finds all of the medical opinions.") (cleaned up). Although the ALJ

referenced Ms. McKnight's letter, she did not assign a persuasiveness value as required, and so

her analysis of this opinion did not comply with the relevant regulations.

An ALJ's failure to properly consider a medical opinion is harmless error where the

medical opinion is "essentially duplicative" of other evidence, or is not "significantly more

favorable" to Plaintiff than other evidence considered by the ALJ, or was otherwise consistent

with the ALJ findings. *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010). If ALJ Sutker's

failure to assign a persuasiveness value to Carol McKnight's opinion is harmless error, remand

would be unnecessary. *See Grega v. Saul*, 816 F. App'x 580, 582 (2d Cir. 2020). However, Ms.

McKnight's medical opinion was the only opinion from a long-term treating psychiatrist in the

record, and described the details and intensity of Plaintiff's mental disorder, especially regarding explanations for Plaintiff's failure to consistently attend appointments and Plaintiff's dependence upon her mother, in a far more favorable light to Plaintiff than other evidence the ALJ considered from agency consultant sources. Given that Carol McKnight's medical opinion is significantly more favorable to Plaintiff than the evidence that the ALJ considered and is not duplicative of other evidence, the ALJ's failure to comply with the relevant regulations is not harmless error, and should be addressed on remand.

Moreover, to the extent that the absence of Carol McKnight's treatment notes complicated the ALJ's capacity to reach a determination of the persuasiveness of this important medical opinion, this constitutes an obvious gap in the medical record, and it was the ALJ's duty to elicit additional details. *Cf. Rusin v. Berryhill*, 726 F. App'x 837, 839 (2d Cir. 2018) (finding that the ALJ is not required to recontact a physician where there are no obvious gaps in the administrative record). This court has previously held that the absence of psychotherapy notes is not a sufficient reason for discounting an important medical opinion. *See Jennifer W. v. Comm'r of Soc. Sec.*, No. 5:19-cv-37, 2020 WL 549357 (D. Vt. Feb. 4, 2020); *see also Soto-Cedeño v. Astrue*, 380 F. App'x 1 (1st Cir. 2010). The fact that the ALJ mentioned the absence of psychiatry notes suggests that this error pervaded the ALJ's analysis. Where, as here, the Plaintiff saw only one specialist for treatment of psychiatric symptoms during the relevant period, it is essential that this specialist's medical opinion and treatment notes are made available to the agency consultants and to the ALJ, or at the very least that the opinion evidence of the treating source is given appropriate consideration under the regulations.

Carol McKnight's treatment notes play a central evidentiary role in establishing the nature of Plaintiff's mental condition, especially as it relates to her independence. Ms.

McKnight's opinion letter is consistent with the remainder of the record regarding Plaintiff's reliance upon her mother. Given the ALJ's failure to assign a persuasiveness value to Ms. McKnight's medical opinion, and the gaps in the agency consultants' and the ALJ's factual conclusions due to the absence of the treatment notes, remand for further development of the record and reconsideration of the persuasiveness of Ms. McKnight's opinion consistent with this opinion is proper.

### 2.   Dr. Sara Roberts and Tracey Niquette, APRN

Separately, ALJ Sutker's determinations that Dr. Roberts' and Tracey Niquette, NP's opinions were unpersuasive because they were it was "conclusory in nature and provide[d] no insight into the claimant's specific abilities and limitations," and "reflect[ed] the claimant's own feelings regarding her abilities and limitations," do not adopt the correct legal standard and are unsupported by substantial evidence. (AR 24.) The ALJ's disposal of Tracey Niquette's opinion on the grounds that it incorporates Plaintiff's subjective self-reporting of her symptoms is improper because the observations and incorporation of a patient's psychiatric conditions into a medical provider's opinion may be considered as objective evidence. *See* 20 C.F.R. § 416.928.

It is not likely that a medical professional could diagnose or treat a patient's psychiatric ailment without first considering the patient's subjective experience of their mental condition. Indeed, this court has previously concluded that "[a] consulting examiner is not required to disregard the claimant's subjective complaints, especially in the context of mental impairments; rather, he [or she] is required to take these complaints into account in making diagnoses and opinions regarding the claimant's functionality." *Wright v. Colvin*, No. 2:14-CV-90, 2015 WL 1649010, at *9 (D. Vt. Apr. 14, 2015) (citing *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) ("The fact that [the doctor] . . . relied on [the claimant's] subjective complaints

hardly undermines his opinion as to her functional limitations, as a patient's report of complaints, or history, is an essential diagnostic tool.")) (cleaned up); *Westphal v. Eastman Kodak Co.*, No. 05-CV-6120, 2006 WL 1720380, at *5 (W.D.N.Y. Jun. 21, 2006) ("[I]n the context of a psychiatric evaluation, an opinion based on personal examination is inherently more reliable than an opinion based on a cold record because observation of the patient is critical to understanding the subjective nature of the patient's disease and in making a reasoned diagnosis."). While there may be permissible grounds for finding NP Niquette's medical opinion unpersuasive within the regulatory framework, NP Niquette's incorporation of Plaintiff's subjective reporting of her psychiatric condition is not one of them.

The ALJ separately noted that NP Niquette "did not address the claimant's psychiatric functioning during the course of office visits." (AR 24.) This conclusion is not a full accounting of NP Niquette's treatment. During Plaintiff's first appointment with NP Niquette in May 2018, Plaintiff reviewed her "active problem list" and "medication list" which included diagnoses for, among other conditions, anxiety, personality disorder, and borderline intellectual functioning, and a prescription for Wellbutrin SR and Cymbalta, both common medications for treating depression. (AR 751–752.) NP Niquette continued to be Plaintiff's prescribing source for her depression medications for at least a year until Plaintiff's last appointment in November 2019.

The medical opinions of Dr. Roberts and Tracey Niquette regarding Plaintiff's psychiatric symptoms are consistent with and supported by Plaintiff's testimony and the totality of the evidence in the record. Plaintiff's subjective self-reported symptoms are strikingly consistent over the course of her medical record. During a neuropsychological evaluation in 2013, she told Dr. Kraybill that although she can bathe, dress, and groom herself independently, she "relies on her mother for most basic needs." (AR 990.) In 2015, she told Dr. Richmond that

"severe panic attacks prevent her from working. She reports that she is scared to leave the house without accompaniment. She reports that she rarely goes anywhere without her mother or wearing headphones and listening to music. . . . She reports that she rarely leaves her home." (AR 1000.) In 2018, Dr. Levine writes that Plaintiff "lives with her mother and cannot leave the house without her. She will leave with her mother only about 3–4 times per week." (AR 491.)

Plaintiff saw Dr. Roberts for several in-person examinations during 2015 and 2016, and saw NP Niquette regularly beginning in May 2018. (AR 751.) While the ALJ is not required to adopt Plaintiff's description of her symptoms contained in a medical record as objective fact, the ALJ's cursory disposal of the opinions of Plaintiff's only long-term primary care providers during the disability period is notable. The result of ALJ Sutker's persuasiveness finding with respect to NP Niquette and Dr. Roberts is that the only two medical experts who repeatedly saw Plaintiff in-person during the disability period are given minimal consideration. On remand, the ALJ should re-evaluate the medical opinions of NP Niquette and Dr. Roberts within the relevant regulatory framework and should not disregard medical opinions solely because Plaintiff's self-reported psychiatric condition is incorporated therein.

### 3.    Dr. Knisely

The ALJ found the opinions of agency consultants Dr. Knisely, Dr. Goldberg, and Dr. Hurley most persuasive. (AR 24.) ALJ Sutker concluded, based on these opinions, that the RFC determination limiting performance to one-to-three step instructions, limited social interactions, limited from working with the general public, and retaining capacity for occasional and simple task changes was "consistent with the medical evidence of record, including the claimant's ability to use public transportation, interact appropriately with treating providers, sit in waiting rooms, and watch television and play video games." (AR 25.) The court reviews whether the

ALJ's decision finding the agency consultants persuasive adheres to the relevant regulations. *See* 20 C.F.R. § 416.920c(a).

Although the report of a state agency medical consultant "constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record," *Frye ex rel. A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012), even under the new regulations, the consistency of the state agency consultants' opinions with observations of the treating sources remains an important factor. *See Shawn H.*, 2020 WL 3969879, at *6. Despite statements from treating sources and from Plaintiff in the medical record indicating Plaintiff struggles to attend appointments, shop, or leave home without her mother, and suffers panic attacks when she does so, Dr. Knisely concludes, "you are able to care for yourself, travel, attend appointments and do basic everyday activities with minimal assistance." (AR 102.) This conclusion is not consistent with Plaintiff's expression of her mental condition in the record, nor is it consistent with the medical opinions of Dr. Roberts, Carol McKnight, Anne Condon, and Dr. Elizabeth Levine who agree that Plaintiff is dependent upon her mother for assistance to comple routine out-of-home tasks. (AR 91–93.)

Dr. Knisely gives only limited consideration to the medical records provided by Carol McKnight because the medical records lack substantial support, and gives limited weight to Dr. Roberts' opinion because "the opinion appears to rely on the assessment of limitations resulting from an impairment for which the source has not treated or examined the individual," and "[t]he medical opinion is without substantial support from the medical source who made it." (AR 100.) Dr. Knisely's conclusion that Dr. Roberts did not treat or examine Plaintiff and did not provide medical support for her diagnoses is plainly incorrect. Dr. Roberts was Plaintiff's primary care provider beginning in July 2015 and continuing until at least May 2017. She examined Plaintiff

on several occasions for both psychiatric care (*see e.g.*, AR 383, noting "dependent personality disorder" and "depression") and physical care. (*see e.g.*, AR 573, 583.) Because the objective medical and other evidence does not support Dr. Knisely's conclusions, the ALJ's persuasiveness finding as to Dr. Knisely does not comply with the relevant regulations.

### 4.    Dr. Edward Hurley, Dr. Howard Goldberg

Edward Hurley, Ph.D. and Dr. Howard Goldberg similarly did not consider Plaintiff's dependence upon her mother in reaching their conclusions regarding Plaintiff's capacity to work. (AR 24–25.) ALJ Sutker adopts Dr. Hurley and Dr. Goldberg's recommendation that claimant's psychiatric functioning would permit her to perform simple and non-social work responsibilities, and finds their opinions to be consistent with the medical evidence of record, "including the claimant's ability to use public transportation, interact appropriately with treating providers, sit in waiting rooms, and watch television and play video games." (AR 25.) This conclusion is another misstatement of the record, which overwhelmingly indicates Plaintiff has difficulty using public transportation or attending medical appointments on her own. Dr. Hurley further writes that Plaintiff "[r]etains adaptive capacities to navigate typical hazards, travel, and make plans independently of others," but he does not discuss the evidence in the record that Plaintiff generally only travels, shops, and attends appointments with her mother. (AR 99.) Thus Dr. Hurley's medical opinion and the conclusion regarding Plaintiff's ability to function independently is inconsistent with and unsupported by the medical and other evidence in the record.

Given the foregoing, substantial evidence does not support ALJ Sutker's persuasiveness determination as to Plaintiff's treating physicians. Indeed, there is little evidence that the state agency consultants weighed whether Plaintiff's relationship with her mother might affect her

ability to work away from the home at all. Due to the incomplete and at times inaccurate factual

conclusions of the agency consultants, and the ensuing flaws in ALJ Sutker's disability and RFC

determinations, the court remands for additional factfinding regarding Plaintiff's capacity to

*independently* perform the type of tasks that would be required of her in a workplace and for

reconsideration of the medical sources as discussed in this section.

**III.     Listing 12.05B**

Plaintiff argues ALJ Sutker should have considered whether Plaintiff meets Listing 12.05

related to intellectual disabilities because Plaintiff's IQ test results fall within the qualifying

range. *See* 21 C.F.R. § 404, Subpart P, App'x 1, Listing 12.05B. Because the ALJ analyzed the

four areas of function within Listing 12.05B in her evaluation of the other mental health listings,

and those listings include the same criteria as requirement 2 of Listing 12.05B, ALJ Sutker's

failure to consider Listing 12.05B is harmless error. However, due to the flaws in ALJ Sutker's

decision already discussed, the ALJ should nevertheless weigh whether Plaintiff meets Listing

12.05B on remand and consider Plaintiff's intellectual disability in the context of her RFC

finding.

## **Conclusion**

Accordingly, the Court GRANTS Plaintiff's motion (Doc. 10), in part; DENIES the Commissioner's motion (Doc. 11), and REMANDS for further proceedings and a new decision in accordance with this ruling.

Dated at Rutland, in the District of Vermont, this 1 day of January, 2022.

Geoffrey W. Crawford, Chief Judge
United States District Court